STATE *vs.* MARTHA MATTHEWS.

1.  The confessions of a prisoner ought to be received with great caution, and unless they are free and voluntary, and without fear produced by threats, or inducements of temporal advantage, ought to be rejected.

2.  The examination of a prisoner as to his own guilt, taken before a committing magistrate, is not admissible in evidence, when the statement is made under the constraint of an oath, and therefore, not voluntary. The objection to the admissibility of such evidence, is much stronger, if the prisoner be under *arrest.*

3.  To authorize the introduction of parol evidence as to confessions of a prisoner, taken before an examining magistrate, it must appear affirmatively that there was no examination recorded as required by law.

4.  Under the Act of 1868-'69, ch. 178, the prisoner is entitled to the benefit of counsel, and before his examination it is the duty of the magistrate to inform him of the charge against him, and "·that he is at liberty to refuse to answer any question that may be put to him, and that his refusal shall not be used to his prejudice." Such examinations are judicial confessions, and the policy of the law requires them to be taken under the protecting caution and oversight of the judicial officer—this caution is an essential part of the proceedings and must be given to a prisoner under arrest, to render his examination admissible in evidence.

5.  The reason of the statute extends to an inquisition by a coroner. In this respect, he is, an examining magistrate.

6.  When a prisoner is brought before a coroner while he is holding an inquisition, and after witnesses had been examined, a *post mortem* examination made, and a verdict entered up, in answer to a question asked by the foreman of the jury "confessed," held, that although after the first question was put, the prisoner was cautioned by the coroner not to answer, the caution came too late, to afford the protection which the law requires, and the confession was inadmissible.

7.  When a physician was examined as a witness, and stated that he had examined the prisoner, and was of opinion that she had been delivered of a child within three or four days, and it was proposed to ask him "whether from his experience and knowledge of females in three or four days after the delivery of a child, and under the circumstances detailed by the evidence, the prisoner

was in a frame of mind to give an intelligent answer, or know what she was talking about?" Held, that the question was proper, and should have been allowed.

8. The rule of law in criminal cases, requiring proof beyond a reasonable doubt, does not require the State, even in a case of circumstantial testimony to prove such a coincidence of circumstances as excludes every hypothesis except the guilt of the prisoner. The true rule is, that the circumstances and evidence must be such, as to produce a moral certainty of guilt, and to exclude any other reasonable hypothesis.

State *vs.* Broughton, 7 Iredell, 96, State *vs.* Young, 1 Winston, 126, State *vs.* Parrish, Busbee 239, Queen *vs.* Johnston, 2 Heard L. C., cases 504, *cited and approved.*

This was an indictment for murder, tried before Cannon, Judge, at Forsythe Superior Court, Fall Term 1871.

The facts of the case are as follows:

On Saturday or Sunday, about the 6th day of May, A. D. 1871, an after-birth was found at a mill pond near the prisoner's residence. The neighbors, believing that a child had been murdered on Monday, drew off the water of the pond in search of its body. While this was going on, the prisoner was brought to the place where the after-birth was found, but then denied any knowledge of it. Nothing being found in the pond, search was made in the woods and the body of a child was found, buried within one hundred yards of the prisoner's house. She and her mother were arrested shortly thereafter. About an hour after dark a coroner's jury and an examining physician arrived at the place and held an inquest. The body of the child was brought near the door of the house in which prisoner lived. While the inquest was being held and a *post mortem* examination was being made by the physician, the prisoner was lying on a bed in the house, (which consisted of a single room,) weeping and groaning. Suddenly, she sprang to the door and as suddenly sprang back again, and fell upon the bed and was much excited. After the *post mortem* examination had been finished, witnesses examined, and verdict of the

jury rendered, the prisoner, in answer to a question asked by the foreman of the jury, confessed. The coroner, after the first question was put, cautioned prisoner, telling her not to answer, that it was none of his business and that her answers would be used against her. Prisoner's counsel asked His Honor to exclude the confessions. His Honor admitted them and prisoner excepted. The physician stated that he had examined the prisoner, and was of opinion that the prisoner had given birth to a child within three or four days before the inquest was held. The prisoner's counsel proposed to ask witness, "from his knowledge of the condition of females in three or four days after the delivery of a child, under the circumstances as detailed by the evidence, the prisoner was in a condition or frame of mind to give an intelligent answer or know what she was talking about?" This question was objected to, and the objection sustained by the Court. In the argument to the jury, the prisoner's counsel proposed to read from a medical work, certain extracts, not as evidence, but as a part of their argument applicable to the evidence. This was objected to, and disallowed by the Court. The theory of the prosecution was, that the child had come to its death by a blow with a stick on the top of its head. The physician testified, that between the scalp and the skull, he found a collection of coagulated blood about the size of a half-dollar with several smaller spots of like kind surrounding it. That in his opinion, it was improbable that a blow upon the top of the head, sufficient to cause death, would not have been attended with contusion or laceration of the skin, a fracture of the skull, &c. That the appearance on the head was not uncommon from natural causes. That he could account for the death otherwise than by violence, viz: by neglect. Upon this testimony the prisoner's counsel asked His Honor to charge the jury, that before they could convict, the evidence must be so strong as to exclude every other reasonable hypothesis than the guilt of the prisoner. His Honor did not so charge, but told the jury the evidence must satisfy them beyond a reasonable doubt.

Prisoner excepted. Verdict of guilty. Rule for a new trial. Rule discharged. Judgment. Appeal to the Supreme Court.

*Attorney General*, for State.
*Morehead & Watson*, for defendant.

DICK, J. The rules of evidence as to the admissibility, on a trial for crime, of the previous confessions of the prisoner, have been much discussed, both in this country and in England, and have given rise to considerable conflict of judicial opinion. It is not necessary for us to enter into this intricate maze of judicial uncertainty as the principles which govern this case are founded in natural justice and upon high authority. The confessions of prisoners are received in evidence upon the natural, as well as legal presumption, that a prisoner will not make an untrue statement, against his own interest. This presumption is weak or strong, according to the various circumstances and facts of the particular case. All the authorities agree that such evidence ought to be taken with great caution and unless the confessions were free and voluntary, and made with deliberation and without fear, excited by threats, or inducement of temporal advantage, they ought to be rejected as evidence on a trial for the admitted crime. *Nemo tenetur seipsum accusare* was a well established maxim of the common law, and was applicable, both in civil and criminal proceedings. Even the Court of Chancery, in enforcing discovery does not depart from this general policy of the law and will not require a party to discover matters to criminate himself, or expose him to a penalty or forfeiture. No examination of a prisoner as to a crime charged against him was allowed in England until the passage of the statutes of *Phil. & M.*—1 *Greenleaf on Ev.*, 256.

The provisions of these statutes were substantially re-enacted in this State, (*Rev. Code, Ch.* 35), and many decisions have been made under them.

It is well settled that the examination on oath of a prisoner as to his own guilt, taken before a committing magistrate is

not admissible in evidence, as the statement was made under the constraint of an oath, and therefore was not voluntary, *State* v. *Broughton*, 7 *Ired.*, 96. The objection, to the admissibility of such evidence, is much stronger, if, at the time of the examination, the prisoner was under arrest, for the alleged crime. *State* v. *Young*, 1 *Winst.*, 126.

To authorize the introduction of parol evidence, as to the confession of a prisoner, before an examining magistrate, it must appear, affirmatively, that there was no examination recorded, as required by law.—*State* v. *Parish, Busb.*, 239.

The Courts, in acting under these statutes, have generally construed them with liberality towards prisoners, and have regarded with suspicion, confessions made to " a person in authority," and have thus manifested a tendency to return to the liberal and humane principles of the common law, upon this subject.

The hardships and injustice, which often occurred to prisoners, under the statutes of Phillip and Mary, and the advancing civilization of the age, called for additional legislation in England, which is now embodied in the statute of 11 and 12 Vict. The principles of this statute are contained in the Acts of 1868 –9, ch. 178. Under this statute, the prisoner is entitled to have the benefit of counsel, and before his examination is commenced, it is the legal duty of the magistrate, to inform him of the charge made against him, and " that he is at liberty to refuse to answer any question that may be put to him, and that his refusal to answer shall not be used to his prejudice, in any stage of the proceedings," and the examination shall be reduced to writing, and submitted to him for correction and explanation. Such examinations are termed judicial confessions, and the policy of the law requires them to be taken under the protecting caution and oversight of the judicial officer. This caution is an essential part of the proceedings, and must be given to the prisoner under arrest to make his examination admissible in evidence.

STATE *v.* MARTHA MATTHEWS.

The reasons of the statute extend to the inquisition of the coroner, for, in this respect, he is an examining magistrate. When a person is slain, it is the duty of the coroner to make inquiry, as to all the material circumstances attending his death, and find out, if possible, who is guilty of the homicide, either as principal or accessory, and "shall cause them to be taken and delivered to the Sheriff, and committed to jail."

In this case, we are only considering the admissibility in evidence of confessions made in the presence of examining and committing officers.    We will not enter upon the many distinctions which have been drawn by Judges, as to what fear, hope, or other inducement will exclude confessions made to other persons in authority, or to private persons.

The law requires its officers to administer justice, with caution and with mercy, and will not allow them to act the part of mere *detectives* of crime.

The fear and apprehension which is naturally produced by an arrest and charge of crime, which is often increased by his ignorance of legal proceedings, and by the manner, appearance and language of the excited crowd, which is usually present when an examination is taken, are well calculated to throw him off his guard, and deprive him of his usual self-possession and prudence.    The present wise and beneficent policy of the law allows a prisoner under arrest, time for deliberation, and an opportunity to obtain correct legal advice, so that the statements which he may make on an examination, are made of his own free will, and with full knowledge of the nature and consequences of his confessions.

The wisdom and enlightened policy of the statute, which we are now considering, are clearly exemplified in the case before us.    From the evidence it appears, that an "after-birth," was found near a millpond, which induced the neighbors to believe, that a recently-born infant had been murdered.    This circumstance naturally produced much excitement, and caused an active search to be made, in which the body of a child was

found. The prisoner and her mother were arrested, and in a short time the coroner and a jury appeared to make an inquisition. A *post mortem* examination was made in the night time, and near the door of the prisoner's house. "During "this time prisoner was in the house, which consisted "of a single room, lying on a bed, weeping and groan- "ing, the house filled with persons; that suddenly she sprang "up and out of the door, and as suddenly sprang back, and "fell upon the bed, and was very much excited. The *post* "*mortem* examination being finished, evidence of witnesses "taken and verdict of jury entered up; in answer to ques- "tions put by the foreman of the jury—*the prisoner confesss-* "*ed*. The coroner cautioned her after the first question was "put, telling her not to answer, it was none of his business "and that her answers might be used against her."

The caution came too late to afford the protection which the law requires. The record does not set out the confession, but it appears to have been made when the prisoner exhibited great agitation and mental distress, and when she must necessarily have been in a condition of physical prostration. She had heard the evidence of the witnesses, and the solemn verdict of the jury as to her guilt. Her response was to a question of the foreman of the jury, and was made without any previous advice as to her legal rights, and the probable consequences of her statement. She no doubt regarded the foreman of the jury as a person in authority, and in her ignorance of the law she felt bound to answer his questions. The verdict of the jury was entered up, and she no longer had any expectation of safety by remaining silent, and, it may be, that she hoped for mercy from her prosecutors, by making a statement in accordance with the verdict of the jury, and the opinion of the crowd. Her mother, who perhaps was her only friend, was under arrest, and charged as the partner of guilt, and she saw no manifestation of sympathy from her neighbors who believed that she had committed a heinous crime.

STATE *v.* MARTHA MATTHEWS.

Even if a previous caution was not required by the Statute, we think under the circumstances of the case, His Honor, would have been justified in rejecting the confessions of the prisoner. The wise and humane rule laid down by Hawkins, before the passage of the *Stat.* 11 *and* 12 *Victoria*, is well stated, and is very applicable to this case. "The human mind, under the pressure of calamity is easily seduced, and is liable in the alarm of danger to acknowledge indiscriminately a falsehood, or a truth, as different agitations may prevail. A confession, therefore, whether made upon an official examination, or in discourse with private persons, which is obtained from a defendant, either by the flattery of hope, or by the impressions of fear, however slightly the emotions may be implanted, is not admissible evidence, for the law will not suffer a prisoner to be made the deluded instrument of his own conviction." 2 *Hawkins P. C.*, *ch.* 46, page 595.

As the confession in this case was made before the coroner, without the previous cautions required by the Statute, it was inadmissible as evidence, and His Honor erred in allowing it to go to the jury. 1 *Greenleaf* on *Ev.*, *ch.* 12. *Roscoe's Cr. Ev.* 55. *The Queen* v. *Johnston* 2 *Heard. L. Cr. Cases* 504.

On the trial, the physician who had been summoned by the coroner, stated that he had made an examination of the person of the prisoner, and in his opinion, she had been delivered of a child a few days before the inquisition was taken. "The prisoners counsel, proposed to ask the witness, from his experience and knowledge of females in three or four days after the delivery of a child, under the circumstances as detailed by the evidence, the prisoner was in a condition or frame of mind to give an intelligent answer, or know what she was talking about."

This question was a proper one, and the witness ought to have been allowed to answer it. The testimony proposed might have been introduced, before His Honor passed upon the admissibility of the confession, and might have had an

8

important influence in determining that matter. At the time it was offered, it was admissible for the purpose of showing, that, an account of the physical condition of the prisoner, little confidence could be placed by the jury in the truth of her statements.

The hypothesis assumed by the prosecution, founded upon the confession of the prisoner, was, that the child was killed by a stroke on the top of the head with a stick. The physician who made the *post mortem* examination, stated on the trial, that this hypothesis was "highly improbable," and gave intelligent reasons for his opinion, and "that he could account for the death of the child otherwise than by violence, to-wit: by neglect." If the prisoner in any manner exposed the child, with an intent to destroy it, or by any other species of criminal neglect caused its death, she might have been convicted under the second count of the indictment. If however, the neglect was not deliberate and wilful, but was the result of poverty, debility or mere inattention, she would not be guilty of a criminal offence. *Roscoe, C., Ev.* 667. There was no evidence to show that the child died from any criminal neglect, so that, there are only two hypotheses which were presented by the testimony. The first founded upon the confession made under the circumstances mentioned; and the secónd arising from natural evidence as understood and explained by a witness of scientific knowledge and professional experience, who was prompted by no motive but a regard for justice and truth.

The law presumes a person to be innocent until the contrary is conclusively proved and the burden of proof is always on the State. All the text writers and numerous judicial opinions declare that criminal cases must not be determined by a preponderence of testimony, but the evidence must be sufficient to produce a full conviction of guilt, to the exclusion of all reasonable doubt. The rule requiring proof beyond a reasonable doubt does not require the State, even in a case of cir-

cumstantial testimony, to prove such a coincidence of circumstances as excludes every hypothesis except the guilt of the prisoner ; the true rule is, that the circumstances and evidence must be such as to produce a moral certainty of guilt, and to exclude any other *reasonable hypothesis.* 1 *Leading Cr. Cases* (*Bennett*) 322. 3 *Greenleaf on Ev., Sec.* 29.

When any reasonable hypothesis of innocence exists in the mind of the jury, there must necessarily be a reasonable doubt as to the guilt of the accused, and he is always entitled to the benefit of that doubt.

The charge of His Honor upon the question of reasonable doubt was the usual formula adopted on criminal trials, but under the circumstances of this case, we think he ought to have given the instructions asked by the counsel for the defence.

There must be a *Venire de novo.*

Let this be certified.