## STATE v. JOSEPH HOWARD.

### *Murder—Confessions—Indictment—Evidence.*

1. The declarations or confessions of a prisoner, either at the time when he is arrested or when he is charged with the crime, are admissible either for or against him when they are voluntarily made, and it is only necessary that the prisoner should be cautioned that he is at liberty to refuse to answer, and that such refusal will not prejudice him, when the confession is made upon an examination before a magistrate.

2. Where it appeared that the officer making the arrest was accompanied by two other men, and that they were all large, strong men, but were not armed, and the prisoner was a small, weakly man, but that no threats or violence were used and no inducements held out; *Held,* that confessions could not be excluded on the ground that the defendant was put in fear by force and numbers.

3. Where it was in evidence that the prisoner and the deceased had gone into a barn together, a witness who passed the barn about a-half an hour afterwards can testify to a conversation he overheard between persons in the barn, although he does not know the prisoner's voice, and can only identify the voice of the deceased.

4. It is unnecessary to aver, in an indictment, any matter which need not be proved. So where an indictment for murder did not set out that "the prisoner, not having the fear of God before his eyes, but being moved and seduced by the devil," and also did not set out that the "deceased was in the peace of God and the State;" *It was held,* no ground to arrest the judgment.

5. Where an indictment for murder sets out the infliction of a mortal wound, and that the deceased "then and there instantly died," it is a sufficient averment that the deceased died within a year and a day from the time of the infliction of the wound.

(*State* v. *Matthews,* 66 N. C., 106; *State* v. *Jefferson,* 6 Ired., 305; *State* v. *Houston,* 76 N. C., 256; *State* v. *McDonald,* 73 N. C., 346, and *State* v. *Morgan,* 85 N. C., 581, cited and approved).

This was an INDICTMENT for murder, tried before *Shepherd, Judge,* and a jury, at Fall Term, 1884, of the Superior Court of CUMBERLAND county.

There was a verdict of guilty, and the prisoner appealed from the judgment pronounced.

The facts are fully stated in the opinion of the Court.

*Attorney General* and *T. H. Sutton,* for the State.
*Mr. R. S. Huske,* for the defendant.

ASHE, J.   The prisoner was indicted for the murder of one
C. L. Blackman.   The evidence on the part of the State dis-
closed the following facts:   On Wednesday, the 29th day of
October, 1884, the day of the homicide, the prisoner and defend-
ant had been together, during the morning, on the premises of
the deceased, where a fire had broken out, and the prisoner assisted
the deceased in controlling it.   That the deceased was indebted to
the prisoner in the sum of fifteen dollars, and, after leaving the
fire and returning to the house of the prisoner, which was about
two and a half miles distance, the deceased paid fifteen dollars to
the wife of the prisoner, and it was then agreed that the interest
should be forgiven, in consideration of the deceased giving the
prisoner as much wine as he could drink.   That the deceased
made wine for sale.   That they went to the house of the deceased
about two hours before dark.   That the prisoner remained there
until after supper.   That after supper the prisoner told the de-
ceased that he wanted some wine, and they went to the barn to get
wine, the barn being about one hundred feet from the house, and
about twenty-one feet from the public road, and the lot around
the barn was inclosed on the side of the road by a plank fence,
leaving a space between the road and the barn.

About dusk, one L. S. Sessom stopped at the fence near the
barn and drank wine with them.   That deceased told Sessom
that he had settled the fifteen dollar land note, and that he was
going to give the prisoner as much wine as he could drink for the
interest.   That Sessom went home, leaving prisoner and deceased
at the barn-door, engaged in a friendly conversation.   That the
wife of the deceased went out and sat with them a short time, and
then returned to the house.   That in half an hour or more, hav-
ing attended to all her domestic affairs, she again went to the
barn and found her husband, lying near the barn-door on the
ground, dead, with his throat cut, and the prisoner gone.   That
there was much blood on the clothing of the deceased and on the
ground.

The wife of deceased testified, when she last saw the deceased
and prisoner together they were in friendly conversation.

It was also in evidence, that on the running board-fence at the corner near the barn, there was a spot of blood, like a thumb or finger print, on the under *inside* part of the top board, which was about five and a half inches wide; and that on one of the lower boards, under this spot of blood, there was the sign of a foot, as of some one getting over the fence. That from the barn-door to the spot of blood, was in the direction of prisoner's house; and the place where the spot of blood was, could not be seen from the gate of the inclosure or the house. It was a dark and cloudy night and rained early in the night. That a crowd gathered from all directions, and there was much passing to and fro, and a number of persons were engaged in turning over and straightening out the body covered with bloody clothes. That there was no evidence of a struggle, nor any disarrangement of the clothing.

The prisoner did not reach home until about 2 o'clock the next morning, and the front of his clothes were wet as if they had been washed. On the inside of one of his pants pockets there was a little blood on the lint and the fibre of the cloth.

It was in evidence that the prisoner was a small and sickly man.

The State introduced as a witness, one Faircloth, a constable, who testified he got the pants, coat and drawers of the prisoner, which were exhibited in evidence, from the prisoner's wife, between the jail and market house, after the prisoner had been put in jail. They were the same pants and coat the prisoner wore on the day of the homicide.. That on the Wednesday night of the homicide witness got a warrant for the prisoner and went to his house next morning about five o'clock, and found him in bed, with nothing on but his shirt.

Witness stated, "when I arrested him I told him I had a warrant against him for a high 'depredation' of the law; that he was charged with killing Cullen Blackman. He answered, 'Amanda, (prisoner's wife) told me one McCaskill said so. I did not do it. I know nothing about it. When I left him he was all right. I submit; if I had wanted to (pointing to his

gun overhead), I could have got another one.'" The witness
further said, "this was all that was said by either of us before
he made the declaration, 'I had no gun, made no threats, nor
held out any inducements, nor did any one do so."

The witness was accompanied by two others, and they were all
large men : no one of them was a justice of the peace, and none
of them had guns, and there was no violence offered. The
declaration was made while the witness was getting his spectacles
to read the warrant. He did not caution the prisoner then, but
did afterwards.

The prisoner objected to the declaration, on the ground that he
was not cautioned, and was put in fear by the excessive force
and numbers. There was evidence that on the same night other
parties went to the prisoner's house, found no gun, and the pris-
oner was absent.

The State then introduced one Morris Hall, who testified, "I
saw the "bulk" of two men at Blackman's barn door, awhile after
dark on the night of the homicide. . I did not recognize either
of them at sight. I was going along the road, on my way to
Sessom's, when I heard a voice I thought was Blackman's, say,
'I don't want to cheat you out of a cent.' My best impression
is, that it was deceased's voice. I had seen him several times
before. I was a stranger in the community, and I heard a
strange voice say, 'God damn you, you can't cheat me out of a
shilling." From the tone of the voice, I did not think there
would be a fight, and as I passed on, the same strange voice said,
'damn you, shut your door,' which was repeated. This was the
same voice that used the expression about the shilling. It was
some time after dark, and the voice came from the barn door.

The prisoner objected to the admission of anything said by the
person with the strange voice, which the witness said he did not
recognize, on the ground that the prisoner was not connected with
it ; and the admission of the evidence, upon objection, was made
the ground of an exception by the defendant.

The jury returned a verdict of guilty. There was a motion for a new trial, which was overruled, and thereupon the defendant moved in arrest of judgment, upon the following grounds:

1. For that the indictment does not contain an averment that the prisoner "not having the fear of God before his eyes, but being moved and seduced by the instigation of the devil," &c.

2. For that it is not alleged in the indictment that the deceased C. L. Blackman was in the peace of God and the State.

3. For it does not appear from the indictment that the deceased C. L. Blackman died within a year and a day from the time of the infliction of the said mortal wound.

4. For that the bill of indictment upon the whole is insufficient.

The motion in arrest was overruled and sentence pronounced against the defendant, from which he appealed.

The first exception taken by the defendant to the ruling of the court below, upon the admission of evidence, was to the admission of the declaration of the prisoner at his house, when arrested by the constable, and the ground of the exception is, that the prisoner was not cautioned by the constable, and was put in fear by excessive force and numbers.

The confessions or declarations of a prisoner at the time of his arrest, or when he is charged with a crime, are always competent either for or against him, when they are voluntarily made.

In this case, what he said to the constable was said without any undue influence whatever. There were no threats, no promises, no questions asked, nor any inducements of any kind held out to him to call forth the declaration. It was free and voluntary. But the defendant's counsel says he was not cautioned. But that is only necessary upon the examination of the prisoner before a magistrate, and is made so by the act of 1868-'9, ch. 178, *The Code,* sec. 1146, which provides, that "at the commencement of the examination, the prisoner shall be informed by the magistrate that he is at liberty to refuse to answer any question that may be put to him, and that his refusal to answer shall not be

used to his prejudice in any stage of the proceedings." *State* v. *Matthews,* 66 N. C., 106.

When made freely and voluntarily to any other person, or on any other occasion, it is admissible against him, and even when made by one in custody, it being his own unbiassed act, it may be proved. *State* v. *Jefferson,* 6 Ired., 305.

The defendant's counsel insisted, that if this ground of the exception failed, it would hold good upon the ground that the defendant was put in fear by force and numbers. But it is untenable upon that ground. In *State* v. *Houston,* 76 N. C., 256, it was held, that "when the defendant, a negro, was arrested by the sheriff and three other white men, and other men afterwards joined the party, and while on their way to the magistrate's, the defendant made certain confessions, no threats or promises or violence being used, such confessions are admissible;" and to the same effect is *State* v. *McDonald,* 73 N. C., 346.

Neither can the other exception taken to the admission of the evidence in regard to the strange voice be sustained.

In inquiring whose voice it was, all the circumstances point to the prisoner. He and the deceased went to the barn together about dark, to get the wine which the prisoner was to drink, in satisfaction of the interest on his fifteen dollar debt. Who but the prisoner could have committed the act? They were alone together at the barn, when the wife of the deceased left them for the short interval of half an hour, and it was in this interval that a witness passed by and drank with them at the barn. There was no one then present there but the prisoner and deceased, and when the witness who testified to the strange voice passed by, he saw the "bulk" of two men at the barn door. Can there be any doubt but these were the prisoner and deceased?

There was no evidence that any one else was there but those two, and the circumstances point unerringly to the fact that the strange voice was that of the prisoner.

The jury might have been well warranted in drawing the conclusion from the evidence, that after the prisoner had drunk freely

of the wine, he became intoxicated, and after he had exhausted the quantity of wine the deceased thought he ought to have in satisfaction of his interest, he refused to let the prisoner have another drink, and, upon the prisoner insisting he was entitled to more wine, a dispute arose between them about the *settlement.* Hence the remark of the deceased, "I would not cheat you out of a cent"; and the reply of the prisoner, "Damn you, you can't cheat me out of a shilling." That meant, probably, the balance claimed by the prisoner, and upon the deceased insisting on his refusal, the answer, "You *shut the barn door*"; and then, being in a rage, excited by his disappointment, with his brain unbalanced by his frequent potations, he drew his knife and cut the throat of the deceased.

The evidence objected to, we think, was clearly admissible.

And as to the grounds of arresting the judgment, we would not consider them, but for the respect the Court entertains for the counsel who has presented them for our determination. The indictment is well drawn, and in the usual form, except it omits the statement, that the "prisoner, not having the fear of God before his eyes, but being moved and seduced by the instigations of the devil," and the further omission of an averment that the "deceased was in the peace of God and the State." It was urged here that these were fatal defects. But these averments are never required to be proved, and what is not necessary to be proved in an indictment, need not be stated—*The Code,* §1189, which declares that "No judgment upon any indictment for felony or misdemeanor, whether after verdict or by confession, or otherwise, shall be stayed or reversed for the want of any matter unnecessary to be proved."

The defendant's counsel has also insisted that the judgment should be arrested, because it is not made to appear that the deceased died within a year and a day from the time of the infliction of the mortal wound, and cited in support of his position *State* v. *Morgan,* 85 N. C., 581. But the counsel has misapprehended the decision in that case. The point there was that

the indictment failed to charge a *mortal wound,* but in this indictment the infliction of a mortal wound is averred, and that the deceased *then* and *there* instantly died. The motion in arrest was without grounds, and was properly overruled.

There is no error. Let this opinion be certified to the Superior Court of Cumberland, to the end that the case may be proceeded with according to law.

No error. Affirmed.