STATE v. ERNEST FOX.

(Filed 2 October, 1929.)

1. **Homicide G a—Evidence of defendant's guilt of murder in first degree held sufficient to be submitted to jury in this case.**

Circumstantial evidence of the prisoner's guilt of murder in the first degree is held under the facts of this case sufficient to be submitted to the jury.

2. **Criminal Law G d—In this case held: testimony as to telegram sent by defendant tending to show his uneasiness was competent.**

Testimony of a witness as to the contents of a telegram sent by the defendant while in the presence of the witness who heard the defendant narrate it to the telegraph operator and saw the operator write it down, which tended to show the defendant's anxiety as to the knowledge of another of "something on" him, is admissible with other circumstantial evidence of defendant's guilt of murder, as a circumstance tending to show guilt, the probative force being for the jury.

3. **Criminal Law G i—Expert testimony as to the position of the deceased when shot held admissible under the facts of this case.**

When the position of the deceased when killed is relevant to the inquiry it is competent for a physician who had examined the deceased and who has qualified as an expert, to testify that the killing was done with a 44 bullet while the deceased was lying down and explain the facts and circumstances upon which he based his opinion, and such testimony does not violate the rule that the issue of the defendant's guilt is exclusively for the determination of the jury.

4. **Criminal Law G l—Where a prior confession is inadmissible a subsequent confession made without fear or hope may be admissible.**

Where the confession of the defendant of his guilt of murder, made to an officer of the law, is excluded by the judge upon a *voire dire* on the ground that it was induced by fear or favor and therefore not voluntary, a later confession, made to another witness, is admissible when the judge finds upon sufficient evidence upon *voire dire* that it was not influenced by the causes which had induced the previous confession and that it was free and voluntary, and made without fear or favor.

APPEAL by defendant from *Small, J.,* and a jury, at June Term, 1929, of EDGECOMBE. No error.

The defendant was indicted for murder of one Jesse Taylor and convicted of murder in the first degree and sentenced to be electrocuted. The State's evidence tended to prove that Jesse Taylor was a young man about 20 years of age and was engaged in the grocery business in Rocky Mount, on East Grand Avenue. That on Saturday night Jesse Taylor was in the store a little after 12 o'clock checking up and counting his money. Jesse Taylor was a single man and customarily slept in his place of business, his father and family resided in another section of

the city, some distance from the store. On the next morning, Sunday, 26 May, the members of the family telephoned the store and received no response, one of his brothers went to the store, and after knocking and hollering, with no response, the brother with others forced an entrance by breaking the door of the store, which was locked on the inside. They found Jesse Taylor on a cot dead, with blood on his head. The two brothers and the father of Jesse Taylor identified a 41 caliber Colt revolver as the property of J. H. Taylor, father of Jesse Taylor, which he had loaned to Jesse Taylor, his son, with instructions by the father to keep same in his store. Neither his father nor brother was able to place the said Jesse Taylor in the possession of the revolver they identified inside of two weeks prior to the time of Jesse Taylor's death. The father, brothers nor did any State's witness see defendant enter or leave the store either on Saturday, 25 May or Sunday, 26 May.

*Louis Perry's* testimony was to the effect that he had known defendant three or four years, and knew where his father lived on 26 May. He saw defendant Thursday, 23 May, at Jesse Taylor's store at an early hour, about five minutes of six o'clock. That Jesse Taylor and two white men and defendant Fox were in the store and were so dressed as to indicate that they had slept in Jesse Taylor's store the night before.

*E. A. Pittman:* Knew Jesse Taylor; he ran a store on East Grand Avenue, No. 600, and rented the store next door to him, No. 602, to Taylor, and then Taylor moved across the street to another building. "The night before Jesse Taylor was killed, Saturday night, Ernest Fox, the defendant, entered my store at about eleven-thirty p.m., and stayed there until I cleaned up and begun to close up. It was a quarter to one when I got cleaned up and closed. While Fox was in the store he just sat at the window in the corner of the building, looking out the window, and didn't have anything to say. The window he was sitting at was on the street side—the west side of the street looking west. There is nothing on the other side but the store where Jesse Taylor kept. Fox was employed at one time by Jesse Taylor. He stopped work about three weeks before Jesse Taylor's death. I saw another delivery boy working for Mr. Taylor afterwards. On the morning of 26 May, I opened my place of business, as near as I can get at, about seven o'clock. Jesse Taylor's body was found about ten o'clock. I went over. The body was lying with the head to one side, and I saw blood here and here (indicating), and I went right back."

*Clarence Taylor* testified: "I identified this book on yesterday as my brother's bank book. I know my brother's handwriting. Yes, that is his handwriting and his figures. I found that deposit slip on Sunday morning that my brother was found dead in the store on the counter near the cash register. I forget what day we found the book, but it was found

in the desk where the money bag was. I saw my brother make out the deposit slip that Saturday night before he was found dead Sunday morning. (State offers in evidence the deposit slip and bank book and the pistol and two bullets about which Dr. Large testified.) I saw my brother checking up Saturday night, but didn't know how much he had until I seen the deposit slip. I never saw that before Sunday morning. I was looking at my brother when he made out the slip and put it in the bank book. I was three or four feet from him. I do not know the exact figures. I found it a little after ten o'clock Sunday morning. I left the store Saturday night around one or one-fifteen. He put the money in the bank book in a bag and tied it up. I don't know what my brother did in respect to the slip after I left. I know what the slip called for. I didn't count the money and couldn't tell you. That is the bag. He had a key ring on his belt and the door key was on there, but what was on the other keys I don't know. I never saw them but one time. I have made a search in the store for them, but have been unable to find them. (State offers in evidence the bag.) I found the bag in the desk Wednesday morning, I believe."

*George Planter:* That he lived on Atlantic Avenue in Rocky Mount and made hogsheads. He identified the 41 caliber Colt revolver—the gun previously identified by the father and two brothers of Jesse Taylor which the father had loaned Jesse Taylor; that defendant came to his house Sunday morning before last between 3 and 4 o'clock and knocked on the door; he was in bed. After some conversation, he pulled out the revolver and handed it to him and said keep it until he called for it. Later on the same morning he tried to buy the pistol on credit from Fox. The revolver had five bullets in it and six chambers, but there was no empty shell in it. Defendant did not tell where he got it or why he wanted him to keep it. The first time he came in a Hudson car like Ben Johnson drives; the second time in an open Ford.

*Ben Johnson:* "Was taxi driver and lived in Rocky Mount. Had known defendant two or three years. He was parked on the morning of 26 May at Douglass Drug Store. Fox said he wanted him to take him home. He carried defendant to various places, one Frank Williams accompanying the defendant: (1) To defendant's home on Pennsylvania Avenue; (2) about five minutes afterwards to George Planters; (3) to Easter Ricks' house; (4) to Wimberly's Pressing Club; (5) to Myrtle Avenue; (6) to Rosa B. Ellis' house, then to Douglass Drug Store, and he and Williams got out. That was about 3:30 o'clock. Fox, when he went to the Pressing Club, got some dresses and carried them to Rosa B. Ellis'. He did not know Planter and heard no conversation between them. He was paid $1.05 for the trip."

STATE *v.* FOX.

*John Jones:* "Lived in Rocky Mount and worked for the Dodge people. He knew defendant, and on Saturday morning, 25 May, defendant came by and wanted to buy an old automobile from him. He for several months was after him to buy an old car. I told him there was an old Ford he could have for $20. He looked at it and liked it, and said he would come after it when he got the money. Told him he had better hurry, as he could not have it unless he came by 6:30 that evening. At ten minutes to six he came back and said he didn't have the money, but expected to get it pretty soon. Next morning about 5:30 he came to witness' house and awoke him and everybody else in his house, and asked if he could get the car that morning. Witness said he thought so, and asked him if he had the money, and he said 'Yes,' and pulled out two ten dollar bills—$20.00. They went over to the foreman's, and he told them he would get down at the place of business about 8 o'clock, and that defendant could get the car. In going to the foreman's defendant went by the police station and through the public streets of Rocky Mount, where he could be seen by both white and colored, and the officers of the law. He did not seem excited, nor did he try to hide or conceal himself. Defendant had a little liquor in his pocket when he came to me that morning, and I told him he had better throw it away because my Boss didn't like liquor, and I didn't want him to see any around. When he came to my house at five-thirty he didn't look like he had drunk a drop."

*Clarence Griffin:* "Drove a transfer in Rocky Mount. About seven o'clock, 26 May, in front of Dunbar's Cafe, defendant hired witness to take him across town to Rosa B. Ellis' house. He stayed there about five minutes, and he brought him back to the transfer shed and put him off at Burnette's Drug Store. He paid him 75 cents, and that was all the money he saw him have; went through the heart of Rocky Mount, colored section, and could be seen by them. Went in public places, and defendant acted perfectly natural; didn't seem in a hurry or scared. He was not flourishing money around like a man that had plenty of it."

*Alexander Grant:* "Lived in Rocky Mount, and had known defendant three or four years. Met defendant Sunday morning, 26 May, at Douglass' Drug Store, and had just come out of Dunbar's Cafe and had a lunch wrapped up. Drove up and asked me if I wanted to go to Wilson. Told him yes, but I had no money, and defendant said he would take care of that part. He and another colored boy went in the Ford that defendant told him he had bought that morning for $20.00. Left Rocky Mount ten minutes to eleven o'clock. Before they left Rocky Mount defendant showed him and the boy $7.00; before they got to Sharpsburg defendant showed them $55.00; said he got the money from his mother, who had sold some Liberty bonds. Said he was going to his aunt's to

get some money left him by a relative, and he had just come of age and could get it. Stopped at Sharpsburg on the way to Wilson. Went to Stantonsburg and Paul Chapel, where defendant's aunt lived. They went to service. Left the chapel about 4:30 p.m., and went to Snow Hill. Returned to Wilson at 7:30; ate supper in a cafe. After supper defendant called up Rosa B. (Ellis) over phone at Rocky Mount. That Fox afterwards told witness that the girl said, 'I know something on you,' and that Fox asked her to meet him at Elm City; that they went to Elm City, but that Rosa B. did not meet them; that they stayed in Wilson that night; that they were having constant car trouble. They stayed that night in a hotel. That on Monday morning they decided to go to Greenville. On the way to Greenville they stopped in Farmville. At Farmville they parked the car near a telegraph office, and that witness sent a telegram to his mother at Rocky Mount; that the other party sent another telegram to some one in Rocky Mount; that Ernest Fox sent a telegram to Rosa B. at Rocky Mount. 'I seen the man write it.' (Question) What did he say to her? (Defendant objects.)

By the Court: Did you hear Fox tell the man what to say in the telegram? Answer: Yes, sir.

Q. Was that in the telegram what Fox said? Answer: He said 'I like to know what you are talking about,' and said to wire him back in care Greenville Western Union. This was about eleven o'clock Monday morning. We then struck out for Greenville. We drove around town, and he got out and parked his car about a block from the Western Union, and went to the Western Union to see if the telegram came. It was twenty minutes to twelve o'clock then, and the telegram hadn't come. He had a suit pressed. Witness then proceeds to tell Fox's movements around Greenville, and about the witness and the witness' companion, aside from Fox, spending Monday night in an automobile in Greenville. The next time we saw him he was under arrest in Greenville. That was the next morning—Tuesday."

*Dr. H. Lee Large* was admitted to be a medical expert. He examined the body of Jesse Taylor on the Sunday morning near eleven o'clock. "The body was on a cot in the northwest corner of the store building. The body was lying on the cot on the right side. He had a bullet wound which entered on the left side or under the left side of his jaw, barely missed the jaw-bone; ran slightly backward and across to enter the base of the skull between the ears. (The witness is here qualified and the court finds as a fact that the witness is an expert in judging the caliber of a pistol and the size of a pistol ball.)

Question: Have you an opinion satisfactory to yourself on this question, as to whether or not Jesse Taylor, the wound which was found in his neck, was inflicted while he was lying or standing up? (Defendant

objects; objection overruled, and defendant excepts.) Answer: Yes, sir, my opinion is that he was lying down.

Question: I ask you to explain so far as you can why you say that? (Defendant objects; objection overruled, and defendant excepts.) Answer: First the range of the bullet from its point of entry to its final point of lodging in the head of this man was such that would have made it impossible for a man to have been in a standing position when the shot was fired; and, secondly, the condition of the body was such as to indicate that the body, in other words, this man had never made any voluntary movement from the time the shot was fired, and it is borne out by the wound. The wound was such as would have caused immediate paralysis of the body, after the bullet was fired. There was no other wound on his body."

Dr. Large further produced the bullet taken from Jesse Taylor's body and testified it was in three pieces and was a 41 caliber bullet.

Witnesses *P. C. Zimmerman* and *R. O. Watson,* police officer, of Rocky Mount and deputy sheriff, respectively, were examined as witnesses for the State. When interrogated relative to an alleged confession of the defendant, the defendant objected; whereupon, said witnesses were examined in the absence of the jury with a view of determining the competency of their testimony relative to said confession. Upon the evidence elicited, in the absence of the jury, the court found as facts: That the statements alleged to have been made by the defendant, both written and oral, in the nature of a confession, were induced either by fear or hope, and that such statements as so alleged to have been made by the defendant were not voluntary in their nature. Upon such findings by his Honor, upon motion of defendant, the evidence of witnesses Zimmerman and Watson, relating to the alleged confessions, were excluded.

In the absence of the jury, the following witnesses were examined: George T. Sugg, defendant Ernest Fox, R. O. Watson, S. P. Marler, to determine the competency or incompetency of the witness George T. Sugg.

Upon the conclusion of the evidence the court below found that as a fact the statement made by the witness George T. Sugg, while said witnesses were inspecting the jail along with other grand jurors, was a voluntary statement and rules the same admissible in evidence. (Defendant objects; overruled; defendant excepts.)

In the presence of the jury:

*George Sugg:* "I was a member of the grand jury during the present six months. I came on the first of January and go through the year. I went to the jail on Monday afternoon and made an inspection. I saw this fellow here, but I didn't know who he was. *I asked him what he was doing in there and what he was in there for, and he told he was in there*

*for killing a man, and I said, 'For what?' and he said, 'For his money.'
I asked him had he been in trouble before, and he said two or three
times. I didn't ask him anything else. I did not put him in any fear to
tell. I did not know who he was when I asked him that; I did not know
that he was the man that was alleged to have killed Jesse Taylor.* I had
been upstairs. I went into all the rooms. All of the grand jury came in
the cell where Ernest Fox was confined, that could get in at one time. I
am not sure about that, though. Some of the grand jury were ahead of
us; we were going all over the house. I don't remember who was with
me at the time of the conversation. There were eight or ten or twelve
people in there. We did not communicate to Ernest Fox what we were
in there for. I did not have any idea that this was the man that was
accused of the Rocky Mount murder. *That's what he said, 'For killing
a man,' and I said 'For what?' and he said, 'His money.'* I asked other
prisoners in the jail what they were in there for, some white and some
colored. I knew nothing about the previous conversations other people
had with Ernest Fox. I had never seen him before that day. We were
in there about four o'clock. That was all he said to me. I don't remem-
ber when I first told what transpired between us. I haven't told an
officer, because I left here and went home. I did not communicate this
conversation to any officer. The sheriff served subpœna on me this
morning."

*P. C. Zimmerman's* testimony was a narrative of a conversation he
had with defendant as to his whereabouts on the night of the killing.
About 12 o'clock defendant and Frank Williams had purchased a half
gallon of whiskey for $2.50 from Dancy Ward on Langley Road the
other side of the A. C. L. Company's pump station. He paid $1.75, Wil-
liams the balance, and they came to town to the Douglass Building, went
in Wimberly's Pressing Club, got some clothes, and Ben Johnson took
him home at 2 o'clock Sunday morning, and was there until 6 o'clock
and went to Douglass Building; went about 9:45 to Wilson. He then
narrated where defendant told him he went. "I asked him what he paid
for the car and he said $20.00. I asked him where he got the money to
buy the car and he said he won it gambling, and I asked him where,
and he said 'Langley Road in a tobacco barn.' I asked him how much
money he had when he bought the car, and he said $43, and I asked him
how much he had when he entered the game, and he said $8.00; and I
asked him how much he won, and he hesitated and I said, 'Did you win
$35.00?' and he said 'Yes.' And I asked him how much money did he
have in his pocket after he bought that automobile, and he said '$43.00,'
and then I asked him where did he get the money to buy the car, and he
said Jim Whitley gave him $4.00, his brother, Harvey Fox, Jr., who is
just a small fellow, gave him $8.00, and he said he had $8.00 at the

house he had saved for the purpose of buying a car. I then asked him if he had any more money from Sunday morning until the time he was arrested except the $43.00 in question, and he said 'No,' that was all he had. . . . I asked him where he was at 12 o'clock and he said at Dancy Ward's buying whiskey. I asked him where he was at 1:30, and he said 'In a tobacco barn, Langley Road, gambling.' I asked him who was in the game, and he said 'Nathan Speight and Charles Woodard and four others.' I asked him where he was at 2:15, and he said 'In the tobacco barn gambling.' I asked him where he was at 3:30, and he said he was still in the tobacco barn gambling. I asked him where he was at 5 o'clock, and he said he was at home. I asked him what time he got up, and he said about 6 o'clock. I then asked him if he knew Jesse Taylor, and he said he did, and I asked him did he ever work for him and he said he did. I asked him how long, and he said three weeks. I asked him did he ever see Jesse's gun, and he said he did before he moved from Pittman's store to the place where he died. I asked him if he had ever spent the night in the store with Jesse Taylor on a pallet on the floor, and he said he absolutely had not; that he had never spent a night in there. There were some more questions, but I can't recall them right now."

The defendant introduced no evidence.

*Attorney-General Brummitt and Assistant Attorney-General Nash for the State.*

*George M. Fountain and T. T. Thorne for defendant.*

CLARKSON, J. The evidence, from the record, is sufficient, with or without the confession of defendant, to be submitted to the jury to sustain a verdict of murder in the first degree. *S. v. Miller, ante,* 445.

The defendant excepts and assigns error to his Honor's permitting the witness Grant to testify as to the contents of the telegram sent by defendant Fox to Rosa B. Ellis. The witness, however, was standing by and heard what Fox said. Not only this, but he saw the man write down on the blank what Fox said: "I seen the man write it." He said, "I like to know what you are talking about," and to wire him care of Greenville Western Union. It was no doubt introduced as some evidence to show Fox's anxiety as to what Rosa B. Ellis meant when she told him over the telephone that "I know something on you." This was admissible for what it was worth—the probative force was for the jury.

The defendant further excepts and assigns error: That it was incompetent "to permit State's witness, Dr. Large, to testify that the deceased, Jesse Taylor, was, in his opinion, lying down when he received the fatal wound, and to further testify as to his reasons, as it invades the province of the jury." We cannot so hold.

In *S. v. Jones,* 68 N. C., at p. 444, it is said: "The only point made was as to the competency of the opinion of the physician who was examined for the State, as to the cause of death of the deceased, and of his posture and position at the time he was shot. It was not denied that the opinion was competent as to the cause of death, but it was insisted that it was incompetent as to the posture and position. We suppose an expert might express an opinion of the posture and position from the range of the shot, and other circumstances."

In *McManus v. R. R.,* 174 N. C., at p. 737, the following observations are made: "It was also urged for error that Dr. McCoy, a witness for plaintiff, who had made a professional examination of the intestate at the time, was allowed, over defendant's objection, to testify that 'from the nature, condition and position of the wounds, he was of opinion that the intestate was lying down at the time the same was inflicted.' It will be noted that this witness, admitted to be an expert, spoke from a professional and personal examination of the intestate, and the answer, to our minds, was clearly within the domain of expert opinion. Both question and answer are approved and upheld, we think, in *Ferebee v. R. R.,* 167 N. C., 290; *Parrish v. R. R.,* 146 N. C., 125; *S. v. Jones,* 68 N. C., 443." *Shaw v. Handle Co.,* 188 N. C., 222; *Butler v. Fertilizer Works,* 195 N. C., 409; *Street v. Coal Co.,* 196 N. C., 178; see *S. v. Carr,* 196 N. C., 129.

The most serious contention of defendant was the admission of the testimony of Grand Juror Sugg, who visited the jail for the purpose of inspection. The defendant's confessions to the officers, made prior to that time, were ruled out on the ground that defendant was induced to make them from fear or hope. The court below, on the *voir dire,* found that they "were induced either by fear or hope, and that such statements as so alleged to have been made by defendant were not voluntary in their nature." These confessions to the officers were, from the findings of the court, properly excluded, and the court below gave the rule that is followed in all civilized nations.

In *S. v. Roberts,* 12 N. C., at pp. 261-2 (1 Dev., 259), relied on by defendant, the law is thus stated by *Henderson, J.:* "Confessions are either voluntary or involuntary. They are called voluntary, when made neither under the influence of hope or fear, but are attributable to that love of truth which predominates in the breast of every man, not operated upon by other motives more powerful with him, and which, it is said, in the perfectly good man, cannot be countervailed. These confessions are the highest evidences of truth, even in cases affecting life. But it is said, and said with truth, that confessions induced by hope or extorted by fear, are, of all kinds of evidence, the least to be relied on, and are therefore entirely to be rejected. It seems to be admitted in this case, that the confessions first made, were of that character, and were therefore

STATE v. FOX.

rejected; but that being repeated to the same person some time afterwards, they lost their original character, assuming that of free and voluntary ones, and became evidence of the truth. But for what reason I am at a loss to conceive. How or whence does it appear, that the motives which induced the first confession had ceased to operate when it was repeated? It is not incumbent on the prisoner to show that they resulted from the same motives. It is presumed that they did, and evidence of the most irrefragable kind should be produced to show that they did not. It is sufficient that they may proceed from the same cause (4 Starkie, 49)."

In *S. v. Fisher*, 51 N. C., p. 478, *Battle, J.*, shows that the reference made by *Henderson, J.*, to Starkie, was from Ed. 1824, p. 49. The learned judge says that "In a subsequent edition (that of 1842, p. 36), Starkie somewhat modifies the rule, and says, 'where a confession has once been induced by such means, all subsequent admissions of the same, or like facts must be rejected if they have resulted from the same influence.'" *S. v. George*, 50 N. C., 233; *S. v. Lowhorne*, 66 N. C., 638; *S. v. Ellis*, 97 N. C., 447; *S. v. Harrison*, 115 N. C., 706; *S. v. Winston*, 116 N. C., 990; *S. v. Rodman*, 188 N. C., 720; *S. v. Whitener*, 191 N. C., 659; 7 A. L. R., 420; *S. v. Newsome*, 195 N. C., 552.

In *S. v. Lowhorne, supra*, at p. 640, we find: "It is true, that in the case of *S. v. Roberts* (1 Dev., 259), the confession was made to the same person, but that, we think, can make no difference."

In *S. v. Drake*, 113 N. C., at p. 628, *Burwell, J.*, in regard to confessions, said: "It is a well settled rule that if promises or threats have been used, it must be made to appear that their influence has been entirely done away with before subsequent confessions can be deemed voluntary, and therefore admissible. And hence, it having been found that an improper influence was used to obtain the confession that was excluded, and it not having been made to appear that that influence had been in any way removed, the confession made on the journey to jail to one of the crown should also have been excluded. *S. v. Drake*, 82 N. C., 592." *S. v. Page*, 127 N. C., 512; *S. v. Bohanon*, 142 N. C., 695; *S. v. Whitener*, *supra*.

"Confessions are to be taken as prima facie voluntary and admissible in evidence, unless the party against whom they are offered allege and show facts authorizing a legal inference to the contrary." *S. v. Sanders*, 84 N. C., at p. 730; *S. v. Rodman*, *supra*.

This Court, through *Dillard, J.*, speaking to the subject in *S. v. Sanders, supra* (84 N. C.), at p. 730, said: "Under the objection made, the admissibility of the confession depended on the facts accompanying it and the legal inference therefrom, the facts being matter for the decision of the judge and conclusive, and the sufficiency or insufficiency thereof to warrant the admission or exclusion of the evidence being matter of law reviewable in this Court. *S. v. Andrew*, Phil. (61 N. C.), 205;

*S. v. Whitfield,* 70 N. C., 356. If from the facts the legal inference be that the confession was voluntary, then the evidence was receivable, otherwise, not." *S. v. Whitener, supra; Smith v. Kron,* 96 N. C., at p. 396.

The confessions made to the officers having been ruled out as incompetent, induced either by hope or fear, it must be made to appear that that influence has been done away with or removed before subsequent confessions can be deemed voluntary and therefore admissible. When objection is made, the competency or incompetency must be heard on the *voir dire.* "*Voir dire*—to speak the truth. This phrase denotes the preliminary examination which the court may make of one presented as a witness or juror, where his competency, interest, etc., is objected to." Black's Law Dic., p. 1212.

The court below on the *voire dire* heard all the evidence introduced, including that of defendant, and found that the statement made to the grand juror was voluntary and admissible in evidence. There was evidence to sustain this ruling, therefore the testimony of the grand juror was properly admitted as evidence, in this we can see no error. From the whole record we can find

No error.