STATE v. WALTER CALDWELL.

(Filed 24 November, 1937.)

**1. Rape § 8—**

Evidence in this prosecution to the effect that defendant obtained carnal knowledge of prosecutrix against her will by threatening to kill her with a knife *is held* sufficient to be submitted to the jury on an indictment charging rape.

**2. Criminal Law § 77b—**

Where the charge is not in the record it will be presumed on appeal that the court correctly charged the law applicable to the facts, and covered all aspects of the case supported by the evidence.

**3. Criminal Law § 81a—**

The finding of the trial court on the *voir dire* that defendant's confession was voluntary is not reviewable when supported by any competent evidence.

**4. Criminal Law § 33—Presence of officers does not render confession involuntary.**

Confessions are competent when they are in fact voluntarily made without hope or inducement, threats or fear; but the fact that a confession was given in the presence of officers of the law, some of whom were armed, and that defendant was told by them that they would like to know the truth, does not render the confession involuntary.

APPEAL by defendant from *Rousseau, J.,* and a jury, at August Term, 1937, of IREDELL. No error.

The defendant was tried and convicted and judgment was pronounced on a bill of indictment charging him, on 31 July, 1937, "with force and arms, at and in the county aforesaid, unlawfully, willfully, and feloniously did commit an assault on one Macie Smith, a female, and her the said Macie Smith, feloniously, by force and against her will, did ravish and carnally know, against the form of the statute in such case made and provided and against the peace and dignity of the State."

Macie Smith, witness for the State, testified, in part: "I know the defendant Walter Caldwell, he has been working for us for a little over a year. I saw Walter Caldwell Saturday afternoon, 31 July, about 4:30. . . . Will Gibson and his wife left and shortly thereafter Walter Caldwell came to the back porch and asked me for some matches, as he had done before on numerous occasions. I secured the matches and handed them to Walter Caldwell, whereupon he placed his foot in the door and came up on the porch and stated that he had something he wanted to tell me. At that time I had my baby girl in my arms, she being about two years of age, and my young son, about eight years of age, was asleep in the house. I then told Walter Caldwell that he did not have anything to talk to me about. He then seized me by the arm and insisted that he had something to tell me and started pulling me toward the kitchen. After he had pushed me in the kitchen I told him that if he had anything to say to go ahead and say it. At that time he had pushed me up against the pantry door. He then stated that 'I know that you know that you can kill me for what I am going to do.' I still had my baby girl in my arms and asked him to let me take her into the house. He would not let me do this, and made me place her on the

floor by us. I stated that I heard an automobile drive up in front of the house and wanted to see who it was. He stated that he would go see who was in the car, and for me not to move from where I was. As he went out of the kitchen door I ran and got into the back yard almost to the well. He came after me and I hollered. He caught me by the arm and dragged me back into the house. He pulled me into the house and into the bedroom where he pushed me across the bed and held the broken blade of a knife to my throat. He stated that if I made any outcry he would kill me. He then accomplished his purpose. . . . During the course of what I have just related I called several times for my young son who was asleep, and Walter Caldwell told me to stop or else he would kill me, and I did not get my son awake. . . . When my husband reached home I told him what had happened. . . . Mr. Plyler and my husband then took me to the Lowrance Hospital in Mooresville and I was examined by Dr. Taylor. I had bruises about my arm, but was not otherwise hurt. . . . I smelled whiskey on Walter Caldwell's breath. He looked as if he was drunk. I have known that he drank liquor before."

Dr. G. W. Taylor, witness for the State, testified: "I examined Mrs. Smith on 31 July, about 6 :30 at the Lowrance Hospital in Mooresville. I examined her and found that some one had recently had intercourse with her. The semen which I extracted was very verile and active. Mrs. Smith told me that Walter Caldwell had assaulted her. I have known Mrs. Smith for a number of years and know her to be a woman of good character. I know the same about her husband, George Smith. She had bruises on her arm and neck. (Cross-examination.) I do not know anything about the occurrence, all I know is that there had been an intercourse. In my opinion within the last three or four hours. She was not lacerated or bruised locally. There were signs of bruises on her arm. There was no evidence of a struggle."

John White Moore, sheriff of Iredell County and witness for the State, testified: "Q. Has the defendant at any time made any statement regarding this matter? Ans.: Yes, sir. Q. Where were you and who was present? Ans.: In jail, in the presence of Carl Bailey, a deputy sheriff and jailer, and Sergeant Lentz, highway patrolman. Q. What did you say to the prisoner or what did you do to him prior to the time he made the statement? Ans.: I warned him of his rights and told him he didn't have to make any statement to me whatsoever; there wasn't anybody going to hurt him, and if he did make a statement that would tend to incriminate him, it would be used against him. I said, 'If you have anything to say I'd like to hear it.' Q. Did you offer any threats of any kind? Ans.: Absolutely nothing. Q. Did you promise him any immunity or any reward? Ans.: No, sir. Q. Did any person in your

presence offer any threat or any immunity or any reward to make the statement? Ans.: No, sir. Q. Did any one else speak to him? Ans.: I believe Sergeant Lentz said 'We would like to know the truth about it.' (The court allowed defendant to ask preliminary questions. Examination by Mr. Joyner.) Q. Sergeant Lentz had on his uniform and a pistol on his side? Ans.: Yes, sir. Q. Caldwell knew you were sheriff? Ans.: Yes, sir. Q. Mr. Bailey had a pistol? Ans.: No, sir. Q. I ask you if you didn't say to him 'The best thing you can do is tell the truth?' Ans.: I don't think I told him. I told him 'We would like to know the truth.' I might have said 'The truth wouldn't hurt anybody,' but I don't think I said the best thing was to tell the truth. Q. If you didn't also tell him it would be lighter on him? Ans.: No, sir. (By the court): Q. Did you tell him it would be the best for him if he did tell the truth? Ans.: I don't know. I might have said the truth didn't hurt anybody and I'd like to know the truth about the situation. Q. You didn't tell him it would be best for him, or better, or lighter? Ans.: No, sir. Q. Did any one in your presence tell him it would be lighter or better for him if he would tell the truth about it? Ans.: No, sir. (The court offered to let the defendant put up any evidence on this particular point. Upon no evidence being produced by the defendant, the court holds the statement made by the defendant was voluntarily made.) (Examination by the solicitor.) Q. What statement did he make? Ans.: He said he was guilty of this crime that he was accused of. I asked him if he was drinking. He said he was at that time. I said, 'Did you get some liquor after you left Mr. Smith's house?' He said, 'Yes, at the Cascade he got a half pint and drank it.' "

Mrs. T. W. Plyler testified, in part: "I am a neighbor and live fifty or a hundred yards from the Smith home. On 31 July, I was at home and heard some kind of a noise at the Smith home, but thought that it was some of the children playing. I dressed and walked down to the Smith home. When I got there Mrs. Smith took me into the kitchen and asked me if I had seen Preacher Caldwell. In a few minutes she whispered to me that Preacher Caldwell tried to kill her and then told me what had taken place. The prisoner was walking out of the back door when I got to the Smith house. (Cross-examination.) I went to the Smith home on purely a social visit and not in consequence of anything I heard at the house. I did not hear any unusual noise at the Smith home and what I heard was like children playing, and it was not in consequence of what I heard that I went to the Smith house. When I came up to the back porch Preacher Caldwell was coming out of the kitchen door. He was not walking slow or fast—was coming, just walking. He did not appear to be excited and I did not notice anything unusual about his appearance. I am familiar with the Smith house

and there is no door or entrance way from the kitchen into the interior of the house. In order to get from the kitchen into the house you must go out on the back porch. I have known Preacher Caldwell since we have been living next to the Smiths and always thought he was a good Negro."

Other corroborating evidence was introduced by the State. The defendant introduced no evidence. Defendant was captured near the Cascade Mills at Mooresville, N. C., about seven miles from the scene of the crime, some three hours after the alleged crime, about 7 o'clock, and did not attempt to escape. He was drinking at the time of the alleged crime and when captured.

The defendant made several exceptions and assignments of error and appealed to the Supreme Court. The material ones will be considered in the opinion.

*Attorney-General Seawell and Assistant Attorney-General McMullan for the State.*

*Jack Joyner and Andrew C. McIntosh for defendant.*

CLARKSON, J. At the close of the State's evidence the defendant made a motion in the court below for judgment as in case of nonsuit. N. C. Code 1935 (Michie), sec. 4643. The court below overruled the motion, and in this we can see no error. The evidence was plenary to have been submitted to the jury.

The charge of the court below is not in the record; the presumption is to the effect that the court charged the law applicable to the facts. We think the evidence objected to competent.

The defendant contends that the prosecuting witness made no outcry, which is a circumstance affecting her credibility to be considered in favor of the accused. *S. v. Dill,* 184 N. C., 645. It is presumed that the court below in the charge covered this aspect, if the evidence supported it. The testimony of the prosecuting witness was "He came after me and I hollered. He caught me by the arm and dragged me back into the house. He pulled me into the house and into the bedroom where he pushed me across the bed and held the broken blade of a knife to my throat. He stated that if I made any outcry he would kill me. He then accomplished his purpose."

The alleged confession of defendant to the sheriff while in jail, in the presence of other officers, we think was voluntarily made. On the *voir dire* the court below examined the sheriff and gave defendant an opportunity to "put up any evidence on this particular point" and held "upon no evidence being produced by the defendant, the court holds the statement made by the defendant was voluntarily made." *S. v.*

*Whitener,* 191 N. C., 659; *S. v. Blake,* 198 N. C., 547. This finding is not reviewable if there is any competent evidence to support same. *S. v. Moore,* 210 N. C., 686 (692-3).

In *S. v. Myers,* 202 N. C., 351 (353), it is said: "The confession in evidence was not made under the impulsion of hope or fear. The suggestion that the accused had better tell who the 'other men' were or that he 'had better go on and tell the truth' has no element of unlawful inducement. As said in *S. v. Harrison,* 115 N. C., 706, 'The rule which is generally approved is, that where the prisoner is advised to tell nothing but the truth, or even when what is said to him has no tendency to induce him to make an untrue statement, his confession in either case is admissible.' No promise was made to induce the confession; no threat was used to extort it. *S. v. Bohanon,* 142 N. C., 695."

In *S. v. Jones,* 203 N. C., 374 (376), is the following: " 'We are not aware of any decision which holds a confession, otherwise voluntary, inadmissible because of the number of officers present at the time it was made. Nor has the diligence of counsel discovered any. *S. v. Gray,* 192 N. C., 594."

In *S. v. Grier,* 203 N. C., 586 (588), it is written: "A confession voluntarily made by a person under arrest is competent. *S. v. Ellis,* 97 N. C., 447; *S. v. Rodman,* 188 N. C., 720; and all confessions are to be taken as voluntary unless the person making them shows facts authorizing a legal inference to the contrary. *S. v. Sanders,* 84 N. C., 728; *S. v. Christy,* 170 N. C., 772. But every confession must be voluntary. The test is whether it was made under circumstances that would reasonably lead the person charged to believe that it would be better to confess himself guilty of a crime he had not committed. It is expressed in various ways. The confession is inadmissible if 'the defendant was influenced by any threat or promise,' or if it is 'induced by hope or extorted by fear,' or if 'fear is excited by a direct charge or hope is suggested by assurance,' or if extorted by 'threats, promises, or any undue influence,' or if 'wrung from the mind by the flattery of hope or the torture of despair,' or by 'actual force,' or the 'hope of escape,' or the statement, 'It will be lighter on you.' *S. v. Roberts, supra* (12 N. C., 259); *S. v. Howard, supra* (92 N. C., 772); *S. v. Whitfield,* 70 N. C., 356; *S. v. Myers,* 202 N. C., 351; *S. v. Livingston, ibid.,* 809." *S. v. Fox,* 197 N. C., 478; *S. v. Gosnell,* 208 N. C., 401.

In *S. v. Stefanoff,* 206 N. C., 443 (444): "Where there is no duress, threat or inducement, and the court found there was none here, the fact that the defendants were under arrest at the time the confessions were made, does not *ipso facto* render them incompetent. *S. v. Newsome,* 195 N. C., 552; *S. v. Drakeford,* 162 N. C., 667. 'We are not aware of any decision which holds a confession, otherwise voluntary,

inadmissible because of the number of officers present at the time it was made. Nor has the diligence of counsel discovered any.' *S. v. Gray,* 192 N. C., 594." *S. v. Tate,* 210 N. C., 613 (617).

No threat or promise of any immunity or reward was made defendant. The confession was voluntary, made neither under the influence of hope nor fear. "I told him we would like to know the truth." This was no inducement. From the competent evidence we think the confession voluntary, and it was so found by the court below.

On the record we see no prejudicial or reversible error.

No error.