The defendant was charged with the murder of Hampton W. Elliott on 15 November, 1939.
Elliott and defendant went to Rocky Mount on 15 November, 1939, and sold some tobacco. The check for the tobacco was made to Elliott *Page 221 
and Hudson. The Planters' National Bank of Rocky Mount paid the check, which was endorsed Elliott and Hudson by H. W. Elliott. The defendant was a tenant of Elliott. Elliott was found dead about 4:00 o'clock in the morning of 16 November, in defendant's yard, about 35 or 40 feet from his front door. On the evening of the 15th, after selling the tobacco, Elliott went to his home, ate supper about 6:00 o'clock and went to a barber shop about a half mile away. At supper time, and before he went to the barber shop, he took no money out of his pocket.
J. Glenn Collier testified, in part: "I recall the evening of the night before Mr. Elliott was killed. He had been to the tobacco market in Rocky Mount that day, and Dollie Lee Hudson and Norman Bishop had gone with him. Mr. Elliott came to the barber shop when he got back that night. I don't know who came with him from his home, but he came in the barber shop. Mr. Elliott came in first, and Dollie Lee Hudson and Norman Bishop came in behind him. Q. Now, please state what you heard Dollie Lee Hudson say to Mr. Elliott while you were in there? A. Mr. Elliott was over there copying the tobacco sales slip from Fenner's Warehouse and handed the one he copied to Dollie Lee Hudson and Dollie Lee said he did not want that one, that he wanted the original that came from the warehouse, and Mr. Elliott said, `I want to keep that in case I want to raise some tobacco next year.' Hudson started out the door. I saw Mr. Elliott with the piece of paper in his hand that I have here. I know Mr. Elliott's handwriting; he made the figures and did the writing on that paper. He laid the piece of paper on the stand for Hudson. When Mr. Elliott left the barber shop he went out the door with Dollie Lee Hudson and Norman Bishop. From the time he came to the barber shop and went out with those men Mr. Elliott did not make any payments to anybody of any sum of money. At the time he made out the copy of the tobacco sale he had the sale for the tobacco with him. . . . I have known Mr. Elliott a long time; have been in the barber shop with him for five years, and during that time saw him every day except Sunday. Q. If you know, will you tell his Honor and the jury where he carried his purse, his bill folder, where he kept his money, if you know? A. In his left hip pocket. . . . Mr. Elliott left the barber shop the night before around ten minutes to 7:00 o'clock. Mr. Elliott went out of the barber shop right behind the two Negroes. I don't know that Bishop was seated in the car when Mr. Elliott went out of the barber shop. I say they left the barber shop together. After 4:00 o'clock I did not see Mr. Elliott's body any more until they brought him home."
Juddy (Julius) Williams testified, in part: "I know Dollie Lee Hudson. I saw him the night that Mr. Hampton Elliott was killed. . . . Norman Bishop came in the store with Dollie Lee Hudson. *Page 222 
Hudson bought a drink and drunk it up, a Pepsi-Cola, and started like he was going to hit me, then started like he was going out the door, and said. Q. Tell his Honor and the jury what you heard Dollie Lee Hudson say when he was going out of the store after drinking the Pepsi-Cola in Mr. Asa Modlin's store. A. He said when he was going out of the door, and near about to the door, `I am going to kill me a man on the way home or home one and get in the woods.' "
Frances Hudson testified, in part: "I am the sister of Dollie Lee Hudson. Last November I was living with my brother, Dollie Lee Hudson at one place and he was farming Mr. Elliott's land. I recall November 15th, the time Mr. Elliott and Dollie Lee carried some tobacco to Rocky Mount. As near as I can guess at it Mr. Elliott and Dollie got back to our home that night about 7:30 or 8:00 o'clock. I was in the house with Dollie Lee's wife and children; her oldest child is three years old. I know when the car drove up. No one drove up in the car but Mr. Hampton Elliott and Dollie. The door to the house was shut; I could not hear any conversation; I could hear the talking but could not hear what was being said. The car drove up not far from the house, about eleven steps. When the car came up to the door the engine stopped. I saw Dollie Lee Hudson that night. Q. Tell what you heard Dollie Lee Hudson say, what you saw him do, and everything you did see him do. A. When the car first drove up we did not go to the door. The motor stopped running. I heard Dollie Lee say before he got to the house, `You said you were not going to give me a God dammed cent.' When we went to the door he was walking fast coming in the house. When Dollie got to the house he went on in the house and went to the bureau and got his gun, a single barrel gun. I don't know who the gun belonged to but he had it there. The gun that is here looks like the same gun. His wife got hold of the gun and he slung her away. After he got the gun and slung her away he got the shell out of the short bureau drawer, the same bureau that he had gotten the gun from behind. When he was trying to get the shell I held the drawer, pushed it, and he pushed me back, took the shell and went on out. I don't know exactly how many shells were in the drawer, or how many shells he carried out. After he had the gun and shells he went back out the door. After that we ran out the back door and after we got out the back door we heard the gun shoot, and after the gun fired we come around the other side of the house and went to the road. When we came around the front Mr. Edmund Elliott's car was sitting on the side of the road. I saw Mr. Hampton Elliott; he was lying on the ground about eleven steps from the front door of my brother's house; he was lying beside his car. Mr. Elliott and his car were about the same distance from the house. Then Dollie's wife and I went on out to the road and left. . . . I *Page 223 
heard some talking but it did not sound like angry voices until I heard completely what Dollie said, then his voice sounded like he was angry or mad. After Dollie came in the house and got the gun and shell we left. As he went out the front door we went out the back."
E. Frank Outland testified, in part: "I am Chief of Police of the town of Rich Square. I have known Hampton Elliott ever since I was about six years old. I have seen him write a number of times in his brother's shop and am familiar with his handwriting. The handwriting on check dated November 15, 1939, for $81.90 is the handwriting of Hampton Elliott. . . . When we got to Hudson's house, we found Mr. Elliott lying face down and I turned him over. He was lying on his stomach with his face down. Mr. Nelson went to the body with me. I got one 50c piece, a dime and a penny out of one of his pockets, the right front pocket if I remember correctly. Nothing else was taken from his person by anyone when we were there. I examined the wounds of Mr. Elliott. He was shot in the neck on the left side. The shotgun made a hole about the size of a silver dollar in his neck. His face was bruised all over, his nose was broken, eyes were bruised. There was one little red place on his chin about the size of a dime. I do not now recall any other scars about his face. . . . We then came back to Rich Square and telephoned to Williamston and Raleigh and had it broadcast. In consequence of the broadcast I went to Robersonville first, then went to Petersburg that night getting there between 8:00 and 9:00 o'clock. I think Petersburg is a little over sixty miles from Rich Square. That was the night of November 16th. I knew Mr. Elliott's car and found it in the storage room of a garage in Petersburg, but I do not know the name of the place. I knew the license number of his car, `North Carolina 1939, 525-842.' I examined the car and found some drops of blood on both sides of the door on the outside and on the inside on the upholstering. The car had one door on either side, and found blood on the outside of both doors. . . . I have seen Hudson since I found the car in Petersburg with bloodstains on it. I saw him in Raleigh and had some conversation with him. I did not threaten him in any manner or offer him any reward or hope of reward. Hudson made the statement to me that he shot Mr. Elliott, and after he shot him he went on back in the house and put the gun up. He told me he beat him before he shot him, and he was lying down in front of the car when he went in the house to get the gun; that he beat him from one side of the car to the other and in front of the car lights, then went in the house and got the gun and shot him. He said he did not do anything to Mr. Elliott after he shot him. . . . Q. Mr. Outland, you testified as to the conversation you had with Dollie Lee Hudson — what statement, if any, did he make to you in regard to what he did with the car when he took it? A. *Page 224 
He said after he shot him he went in the house, changed clothes and left, took the car and went to Petersburg; said he parked the car on a log camp or sawmill lot, and locked it and left the keys on the running-board. . . . It was about two weeks after then, around the first of December, that Dollie Lee Hudson told me in Raleigh about shooting Mr. Elliott and driving his car away. He said he left the car in Petersburg on a sawmill lot back off where they kept logs. We did not find Hudson in Petersburg."
Dr. J. C. Vaughan testified, in part: "I am a practicing physician in Rich Square; have been practicing medicine for 25 years. (Court holds Dr. Vaughan is a medical expert.) I knew Hampton Elliott. I examined the head, face and neck of Mr. Elliott after he was brought to the undertaker's establishment in the morning between 8:00 and 9:00 o'clock. He had a small laceration across the bridge of his nose, nose fractured and broken in, and bruises about his forehead and between the eyes. He had a wound in the side of his neck on the left that struck the corner of his lower jaw, tore the skin away slightly and penetrated the whole of his neck and shot it out. I have an opinion satisfactory to myself that Mr. Elliott's death was caused by the shotgun wound in his neck."
It was in evidence by an expert, from examination, that it was human blood on the car of Elliott found in Petersburg, Va.
Edward Elliott testified, in part: "I left town on Wednesday night around 7:00 o'clock and went down to Hudson's house which is a little better than 2 or 2 1/2 miles from town. Before that I had seen the car which Mr. Elliott drove; he had driven out to the field where we were picking peas. The old car had been sitting in Hudson's yard. I did not notice any other car there that night. When I drove up beside the road and blew my horn, one of the women, his sister or wife, answered me. In consequence of what she said to me and being called, Dollie Lee Hudson came from towards the house to my car. Q. What did he say to you? A. He said, `You came after the package you sent me for,' and I said `Yes.' He said, `I have the stuff you sent after here' and he had it with him when he came to the car. At that time he delivered to me three pints of whiskey, A.B.C. store whiskey, one pint for me and the other two pints for two other people. . . . I did not hear the sound of any shotgun at the time. The only conversation I had with Dollie Hudson he told me he had the stuff I sent after. Q. What did he say? A. He said he looked for me in passing to give it to me but did not see me, that Mr. Elliott said he would bring him home but he stopped to eat supper and he drove Mr. Elliott's car home and had to carry it back. At that time the car was standing in his yard. I don't know where he got the packages from when he came to the car with them. I did not stay there over three or four minutes, left and drove back toward Rich Square. I heard no shotgun fire." *Page 225 
Sheriff J. C. Stephenson testified, in part: "Nobody offered him any reward or threatened him in any way, or made him any inducement to make any statement. Mr. Tyler told Dollie Lee he better keep his mouth shut and pray. Dollie Lee made the statement in Mr. Outland's presence that he beat up Mr. Elliott, ran in the house and got the gun and came out and shot him, and never touched him after he shot him."
Defendant testified, in part: "This happened to me on November 15, 1939, and I was not of myself and I do not know whether I killed Mr. Elliott or not. When I came to myself I was in the house and I heard Mr. Edward Elliott call out and I ran out the back door scared to death, and do not know anything about the shooting or anything. When Mr. Edward Elliott came up I went out to the road where he was, and he asked did I bring his stuff and I told him I did. I brought one package for C. A. Vaughan, one for Mr. Frank Rome and one for him and I gave them to him and he went on back to town. . . . I went to the bank with Mr. Elliott; went down the street the bank was on and went to the bank and he went in. I went in the bank with him but he has never showed me the bill or check or anything. When he paid me for the tobacco grading he paid me $10.35, if I am not mistaken. He gave me the $10.35 in the bank after the tobacco was sold. . . . I asked Mr. Elliott how much the grading come to and he said $10.35 to the best of my remembrance and he gave me $10.35 and said, `Well, you are out of debt.' I asked him about letting me have some money to get my little boy some underwear. He ran his hand in his pocket and gave me $5.00 out of his pocketbook. . . . Mr. Elliott gave me a little, small piece of paper and handed it to me and said, `Here is your memorandum' and I did not take it. I said, `That is not fair, you had the check and have not let me see the bill,' and he said, `I want to keep it in case I want to raise some tobacco next year.' I said, `You could let me have it and let my wife and sister see it, and know whether we are in debt or out of debt,' and he said, `You are out of debt.' . . . He was still worried with me when we got to my house and Mr. Elliott said, `Get out of this car and go and get my damned potato baskets.' I went to the house to get them and he came with his hand like this and it was dark. I ran around the house three times and told him I did not want any trouble and ran around the house then, and the next time he came around the house and met me, and I was so worried and so disgusted I do not know how it happened. I never did get to the baskets. That is the way it happened. I do not remember leaving my home that night in Mr. Elliott's car. It was 25 or 30 minutes before my right mind came to me a little bit enough to know what had happened. The baskets were in the house they have been calling the car shelter. I disremember how many baskets there were there, but seven, eight or more. I never *Page 226 
did get the baskets; he was chasing behind me and I did not even get my hands on the baskets. . . . In a few minutes Mr. Edward Elliott came up and called, and my wife and sister don't know a bit about it, only I ran into the house and burst the door scared to death, and do not remember getting the gun any more than you do. . . . I was scared and thought about what had happened, and was afraid they would catch me that night, and mob me up, and to the best of my knowledge I pulled out from there and went to Petersburg. . . . I surrendered myself to the officers in Newark, N.J. . . . While I was in Raleigh Mr. Tyler, Sheriff Stephenson and Mr. Outland came to see me. Mr. Outland did not say a thing to me, only asked what did I do with Mr. Elliott's money, and I did not get no money off of Mr. Elliott. . . . I had $15.00 when I left on Mr. Elliott's car. He gave me $5.00, and I had had $5.00 for two or three weeks that I made working for Mr. Rome, was keeping it to get some shoes when I went to sell the tobacco. . . . This gun is not my gun; it belongs to a Futrell boy but I have had it a long time. It is the gun I had in my house on the night Mr. Elliott was killed. I do not say I did not shoot Mr. Elliott; I do not know how it happened. The gun I had in my house that night had some shot in the stock. I have told as near as I can everything that happened from the time we got to Rocky Mount that day. After Norman Bishop got out of the car at his home is when Mr. Elliott and I got to fussing. Then my mind went completely blank and I do not know how it happened. I remember Mr. Elliott coming on me with his hand drawn back; I don't know what he had in his hand at the time. I did not say in the Halifax County jail in the presence of Sheriff Riddick and others that Mr. Hampton Elliott had his hand up and was coming toward me. I remember when Mr. Elliott was advancing on me and running around the house three times. To the best of my knowledge everything went blank to me then. I am not sure I fired the gun or got the shell. I don't remember that Mr. Elliott was lying on the ground when I delivered the three pints of liquor to Mr. Edward Elliott. . . . I don't know a bit more about what happened than a monkey. I have told to the best of my knowledge all I know. I am pleading for the mercy of the court if they can give it. . . . I have tried to tell all about it but I am not sure what happened. I don't remember beating him up, shooting him or anything; don't remember getting his automobile. I drove Mr. Elliott's car to Petersburg. . . . I am not sure what I said to Mr. Edward Elliott. I know I got the whiskey for him in Rocky Mount. I ain't for sure but I think I delivered it to Mr. Edward Elliott. . . . I cannot tell how human blood was on the car. I am not for sure that I took my fist and broke his nose, beat his face and threw him out of the car. Somebody else could *Page 227 
have put the blood on the car, in Petersburg maybe. . . . I am not sure about nothing I done to Mr. Elliott and whether I hit him after I shot him or not. I don't know whether I beat him first and then shot him. I don't know how long it was before I come to my right senses, or whether I hit him or not. I don't know why I don't remember making the statements my sister says I made when I was going to the house. I don't remember going to the house."
Cora Hudson, wife of defendant, testified for defendant, in part: "I was at home that day when my husband came from Rocky Mount. I was in the house and Dollie Lee Hudson came in the house. All I know he came in the house and got the gun, but what he done I don't know because I run out."
The jury returned a verdict: "Upon their oath, say that the said Dollie Lee Hudson is guilty of the felony and murder as charged in the bill of indictment, in the first degree."
The court below rendered judgment on the verdict: "In the manner provided by law, cause the said Dollie Lee Hudson to inhale lethal gas of sufficient quantity to cause death, and the administration of such lethal gas must be continued until the said Dollie Lee Hudson is dead — and may God have mercy upon his soul."
From the judgment pronounced on the verdict of guilty of murder in the first degree, the defendant made numerous exceptions and assignments of error and appealed to the Supreme Court.
The law in reference to homicide is as follows: N.C. Code, 1939 (Michie), sec. 4200: "A murder which shall be perpetrated by means of poison, lying in wait, imprisonment, starving, torture, or by any other kind of willful, deliberate and premeditated killing, or which shall be committed in the perpetration or attempt to perpetrate any arson, rape, robbery, burglary or other felony, shall be deemed to be murder in the first degree and shall be punishable with death. All other kinds of murder shall be deemed murder in the second degree and shall be punished with imprisonment of not less than two nor more than thirty years in the State prison."
Sec. 4614 is as follows: "In indictments for murder and manslaughter, it is not necessary to allege matter not required to be proved on the trial; but in the body of the indictment, after naming the person accused, and the county of his residence, the date of the offense, the averment `with force and arms,' and the county of the alleged commission of the offense, *Page 228 
as is now usual, it is sufficient in describing murder to allege that the accused person feloniously, willfully, and of his malice aforethought, did kill and murder (naming the person killed), and concluding as is now required by law; and it is sufficient in describing manslaughter to allege that the accused feloniously and willfully did kill and slay (naming the person killed), and concluding as aforesaid; and any bill of indictment containing the averments and allegations herein named shall be good and sufficient in law as an indictment for murder or manslaughter as the case may be."
The bill of indictment is as follows: "The Jurors for the State upon their oath present, That Dollie Lee Hudson, late of the County of Northampton, on the 15th day of November, in the year of our Lord one thousand nine hundred and thirty-nine, with force and arms, at and in the County aforesaid, did unlawfully, willfully and feloniously, with premeditation and deliberation and of his malice aforethought kill and murder one Hampton W. Elliott, against the form of the statute in such case made and provided and against the peace and dignity of the State."
At the close of the State's evidence and at the close of all the evidence, the defendant in the court below made motions for judgment of nonsuit. N.C. Code, 1939 (Michie), sec. 4643. The court below overruled these motions, and in this we can see no error.
The evidence succinctly: The dead man, Hampton W. Elliott, was the landlord and defendant the tenant. Their tobacco was sold in Rocky Mount for $81.90 and check made to both of them, but cashed by Elliott. There was evidence to the effect that there was a dispute between them. The defendant testified, in part: "Mr. Elliott gave me a little, small piece of paper and handed it to me and said, `There is your memorandum' and I did not take it. I said, `That is not fair, you had the check and have not let me see the bill,' and he said, `I want to keep it in case I want to raise some tobacco next year.' I said, `You could let me have it and let my wife and sister see it, and know whether we are in debt or out of debt,' and he said, `You are out of debt.' "
It was further in evidence: "He (defendant) said when he was going out of the door, and near about to the door, `I am going to kill me a man on the way home or home one and get in the woods.' "
The chief of police of Rich Square testified, in part: "I did not threaten him in any manner or offer him any reward or hope of reward. . . . He said after he shot him he went in the house, changed clothes and left, took the car and went to Petersburg; said he parked the car on a log camp or sawmill lot, and locked it and left the keys on the running-board."
The sheriff testified, in part: "Nobody offered him any reward or threatened him in any way, or made him any inducement to make any *Page 229 
statement. Mr. Tyler told Dollie Lee he better keep his mouth shut and pray. Dollie Lee made the statement in Mr. Outland's presence that he beat up Mr. Elliott, ran in the house and got the gun and came out and shot him, and never touched him after he shot him."
The cause of Elliott's death was a "shotgun wound in his neck." There was evidence that Elliott and defendant drove in defendant's yard in the car and when defendant got to the house he went in the house and went to the bureau and got his gun, a single barrel gun. Defendant got some shells and went out of the door and shortly afterwards a gun shot was heard and Elliott was seen lying on the ground. Before defendant went into the house to get the gun "his voice sounded like he was angry or mad." In detail, the evidence, both direct and circumstantial, pointed to defendant — that he shot Elliott willfully, with premeditation and deliberation. Defendant testified: "I ran around the house three times and told him I did not want any trouble and ran around the house then, and the next time he came around the house and met me, and I was so worried and so disgusted. I do not know how it happened. I never did get to the baskets. That is the way it happened. . . . I don't know a bit more about what happened then than a monkey. I have told to the best of my knowledge all I know. I am pleading for the mercy of the court if they can give it."
The defendant excepted and assigned error to the following evidence: (1) "Q. Now, please state what you heard Dollie Lee Hudson say to Mr. Elliott while you were in there? A. Mr. Elliott was over there copying the tobacco sales slip from Fenner's Warehouse and handed the one he copied to Dollie Lee Hudson and Dollie Lee said he did not want that one, that he wanted the original that came from the warehouse, and Mr. Elliott said, `I want to keep that in case I want to raise some tobacco next year." Hudson started out the door. (2) Q. If you know, will you tell his Honor and the jury where he carried his purse, his bill folder, where he kept his money, if you know? A. In his left hip pocket. (3) Q. Tell his Honor and the jury what he heard Dollie Lee Hudson say when he was going out of the store after drinking the Pepsi-Cola in Mrs. Asa Modlin's store. A. He said when he was going out of the door, and near about to the door, `I am going to kill me a man on the way home or home one and get in the woods.' (4) (Testimony of Edward Elliott.) Q. What did he say to you? A. He said, `You come after the package you sent for' and I said `Yes.' He said, `I have the stuff you sent after here' and he had it with him when he came to the car. At that time he delivered to me three pints of whiskey, A.B.C. store whiskey, one pint for me and the other two pints for two other people. . . . When I went to Dollie Hudson's house I parked my car beside the road, about 35 or 40 yards from the house to the road *Page 230 
where my car was parked. I did not hear the sound of any shotgun at the time. The only conversation I had with Dollie Hudson he told me he had the stuff I sent after. Q. What did he say? A. He said he looked for me in passing to give it to me but did not see anything of me, that Mr. Elliott said he would bring him home but he stopped to eat supper and he drove Mr. Elliott's car home and had to carry it back. At that time a car was standing in his yard. I don't know where he got the packages from when he came to the car with them. I did not stay there over three or four minutes, left and drove back toward Rich Square. I heard no shotgun fire."
As to the first contention: It tended to show motive and was some evidence, the weight was for the jury. Then again, the defendant testified to the same effect. In Shelton v. R. R., 193 N.C. 670, at p. 674, we find: "It is thoroughly established in this State that if incompetent evidence is admitted over objection, but the same evidence has theretofore or thereafter been given in other parts of the examination without objection, the benefit of the exception is ordinarily lost." Tillett v. R.R., 166 N.C. 515; Beaver v. Fetter, 176 N.C. 334; Marshall v. TelephoneCo., 181 N.C. 410.
As to the second contention: The charge of the court below is not in the record and the presumption is that the court below charged the law applicable to the facts. The bill of indictment alleges "Unlawfully, willfully, and feloniously, with premeditation and deliberation and of his malice aforethought." Under this bill it was competent on premeditation and deliberation to show that the motive was robbery, and there is circumstantial evidence to that effect.
As to the third contention: This regarded the alleged threat. It was made after the dispute over the tobacco sales. It was not too remote or indefinite under the facts in this case. Its weight was for the jury.
In S. v. Bowser, 214 N.C. 249 (253) (quoting from S. v. Shouse,166 N.C. 306), it is said: "General threats to kill not shown to have any reference to deceased are not admissible in evidence, but a threat to kill or injure someone not definitely designated are admissible in evidence where other facts adduced give individuation to it," citing S. v. Payne,213 N.C. 719. S. v. Johnson, 176 N.C. 722; S. v. Wishon, 198 N.C. 762;S. v. Hawkins, 214 N.C. 326.
As to the fourth contention: The exception to the testimony of Edward Elliott cannot be sustained. Testimony to the same effect appears in other parts of the record without objection from the defendant's own testimony.
Defendant contended that the before mentioned evidence "Was irrelevant as set out in all the above exceptions and the cause of the defendant was prejudiced by the admissions, in that it tended to excite the *Page 231 
commiseration of the jury for the deceased and tended to lead them to act on sentiment and sympathy instead of proof. S. v. Arnold, 35 N.C. 184."
As stated, we think none of the contentions can be sustained. The rule stated in 1 Wharton, Criminal Evidence (11th Ed.), sec. 230, at p. 274, is as follows: "Facts tending to create sympathy or prejudice. Evidence which is offered solely for the purpose of creating sympathy for the accused, or which is offered for the sole purpose of improperly appealing to the prejudice of the jury against the accused, should be excluded. However, evidence which is otherwise competent and material should not be excluded merely because it may have a tendency to cause an influence beyond the strict limits for which it is admissible."
It should be noted that in the only case cited by the defendant in support of his position, the testimony was held to be competent and not calculated to prejudice the minds of the jury although the court did correctly state by way of dicta that evidence really irrelevant in point of law may have such a tendency, and that if it did, to admit it would be erroneous. S. v. Arnold, 35 N.C. 184.
The defendant further contends: "It was error to have denied the motion of the defendant that all evidence tending to show robbery as a motive be stricken from the record. The indictment alleges that the defendant, `with force and arms, did unlawfully, willfully and feloniously, with premeditation and deliberation and of his malice aforethought kill and murder one Hampton Elliott.' By inserting in the bill of indictment the words `premeditation and deliberation,' murder in the perpetration of a robbery was excluded therefrom. By omitting the words, `With premeditation and deliberation,' from the bill of indictment, the defendant would have been put on notice that evidence tending to show that the murder committed in the perpetration of a robbery or any other felony would have been admissible, but by inserting the elements of premeditation and deliberation in the bill of indictment, the State forfeited its right to show anything but premeditated and deliberate murder. The bill of indictment itself dismissed from the mind of the defendant all idea of a defense against the robbery element." This contention cannot be sustained.
The bill of indictment alleged "Unlawfully, willfully and feloniously, with premeditation and deliberation and of his malice aforethought." This charge was sufficient, under the statute heretofore cited, if the facts justified it, to convict the defendant of first degree murder. The jury convicted him "Of the felony and murder as charged in the bill of indictment in the first degree." To be sure the bill did not charge that the murder was "committed in the perpetration or attempt to perpetrate . . . robbery . . . shall be deemed murder in the first degree and *Page 232 
shall be punishable with death." The circumstantial evidence as to killing to rob was some evidence on the charge of premeditation and deliberation. The presumption, the charge not being in the record, is that the law on all the aspects of the evidence, was properly presented to the jury in the charge. The evidence relating to robbery was relevant for the purpose of establishing a motive for the killing. It is always competent to show the motive for the commission of a crime, although this does not constitute an element of the crime. S. v. Grainger, 157 N.C. 628; S. v. Wilkins,158 N.C. 603; S. v. Allen, 197 N.C. 684. Thus, evidence of robbery would be admissible as part of the chain of evidence establishing murder in the first degree with premeditation and deliberation.
The defendant contends, lastly, that there was error in the following: "Q. Mr. Outland, you testified as to the conversation you had with Dollie Lee Hudson — what statement, if any, did he make to you in regard to what he did with the car when he took it? A. He said after he shot him he went in the house, changed clothes and left, took the car and went to Petersburg; said he parked the car on a log camp or sawmill lot, and locked it and left the keys on the running-board."
Defendant's contention is that the answer was erroneously admitted in that the following part was not in response to the solicitor's question and was in the nature of a confession which might or might not have been voluntary: "He said after he shot him he went in the house, changed clothes and left." The only objection, it will be noted, was made before the answer was given. No motion to strike the answer was made. The exception is untenable, in the first place, because the objection that the answer was unresponsive or improper in other respects was waived by failure to move that it be stricken.
In Gilland v. Stone Co., 189 N.C. 783, at p. 786, the following statement appears: "If defendant deemed the statement of the witness, which was not in response to the question directed to him by counsel, but voluntarily made, incompetent and prejudicial, it should have directed its objection to the court, accompanied by a motion to strike the objectionable statement from the record, and by a request for an instruction, if desired, to the jury that the statement had been stricken from the record and should not be considered as evidence." Luttrell v. Hardin, 193 N.C. 266 (269);S. v. Gooding, 196 N.C. 710 (711). We think the evidence competent. If not voluntary, defendant should have shown it by evidence on the voir dire.
In S. v. Hammonds, 216 N.C. 67 (75), it is written: "In S. v. Steele,190 N.C. 506 (511-12), Varser, J., for the Court said: `The requirement, in first degree murder, in order to constitute "deliberation and premeditation" does not require any fixed time beforehand. These *Page 233 
mental processes must be prior to the killing, not simultaneous, "but a moment of thought may be sufficient to form a fixed design to kill,"'" citing numerous authorities to the same effect. The record discloses two voluntary confessions made by defendant that he killed with premeditation and deliberation.
In S. v. Grier, 203 N.C. 586 (589), it is said: "But every confession must be voluntary. The test is whether it was made under circumstances that would reasonably lead the person charged to believe that it would be better to confess himself guilty of a crime he had not committed. It is expressed in various ways. The confession is inadmissible if `the defendant was influenced by any threat or promise,' or if it is `induced by hope or extorted by fear,' or if `fear is excited by a direct charge or hope is suggested by assurance,' or if extorted by `threats, promises, or any undue influence,' or if `wrung from the mind by the flattery of hope or the torture of despair,' or by `actual force' or the `hope of escape,' or the statement, `It will be lighter on you.' S. v. Roberts, supra (12 N.C. 259);S. v. Lowhorne, supra (66 N.C. 638); S. v. Howard, supra (92 N.C. 772);S. v. Whitfield, 70 N.C. 356; S. v. Myers, 202 N.C. 351; S. v.Livingston, ibid., 809." The confession in the present case was not characterized by any of these or similar circumstances, therefore competent.
The defendant in most particulars admitted the material evidence of the State, but as to the actual killing said, "I don't know a bit more what happened than a monkey." After Cain killed Abel, it is written: "And the Lord said unto Cain, `Where is Abel, thy brother?' And he said, `I know not, Am I my brother's keeper?' " (Gen. 4:9.)
We can find no prejudicial or reversible error on the record.
No error.